Filed 4/22/13  P. v. Davis CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>AYRIANNA ANGENET DAVIS,<br><br>Defendant and Appellant. | B239829<br><br>(Los Angeles County<br>Super. Ct. No. KA096375) |

APPEAL from a judgment of the Superior Court of Los Angeles County. David C. Brougham, Judge.  Reversed.

Kelly C. Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Blythe J. Leszkay and Scott A. Taryle, Deputy Attorneys General, for Respondent.

_____

Appellant Ayrianna Davis was charged with a single felony count of attempting to dissuade a witness from prosecuting a crime. (Pen. Code, § 136.1, subd. (b)(2).) On Friday, February 24, 2012, during voir dire of prospective jurors for her trial, the court denied Davis's motion to represent herself in pro. per. Midday on Monday, February 27, the jury was sworn, and that afternoon it heard the testimony from two prosecution witnesses and Davis's testimony in her own defense. On February 28, the jury was instructed and commenced deliberations. On the morning of February 29, 2012, it rendered its guilty verdict.

Davis appeals from the judgment on a number of grounds, including her contention that the trial court erred in denying her motion to represent herself at trial. Because we conclude that this error requires reversal of her conviction, it is unnecessary to discuss her other contentions.

## STATEMENT OF FACTS

In late November, 2011, Aridai Mendez's 16-year-old sister Lilibeth and her sister's friend Joselyn had reported that Leonard Alcala, a neighbor who lived with his family in a house behind the Mendez family home in El Monte, had tried to rob them at gunpoint.[1] Lilibeth and her parents had reported the incident to the police, and Alcala had been arrested. Alcala was held to answer on four felony charges, including one count of attempted second degree robbery, attempting to take personal property from Lilibeth by force or fear.

On November 29, 2011, Davis approached Detective Batres of the El Monte Police Department at the El Monte courthouse, telling him that the incident with Alcala had not happened as the victims had reported it. Batres told Davis not to contact the Mendez family.

On December 6, 2011, Batres received a phone message from Davis saying that she was a family friend with information about the Alcala case, and that unless he

---

[1] Because Aridai and Lilibeth Mendez share the same last name, we refer to them by their first names.

2

returned her call she intended to contact his watch commander, or an attorney, in order to "get the truth on the record."  Batres returned the call the same day, leaving a message for Davis.

On the evening of December 6, 2011, Aridai (who was then 18) was home with her seven-year-old sister when she saw Davis looking through the home's mesh security door.  Davis asked Aridai if she was Joselyn's friend.  When Davis identified herself as Alcala's girlfriend, Aridai closed and locked the security door, and (pretending to be texting) used her telephone to make an audio recording of her conversation with Davis, which lasted about 20 minutes.

Davis told Aridai in the December 6 conversation that  "the attempted robbery was kind of, like a lie"; the incident with Alcala had been "a drug deal gone bad" in which Lilibeth and Joselyn "were trying to get dope back from [Alcala]," and they had gone to the police with their robbery accusation when he would not agree.  "[W]hat I'm asking for here is for people to tell the truth and be righteous about it," and to not lie to "put somebody behind bars."  Davis also noted that because the girls were doing drugs and dealing drugs, if Child Protective Services became involved, Aridai's parents could go to jail and have their daughter taken away from them.  "They're going to lie to the police about some shit that's really going on.  The parents are going to jail and the girls are taken away. . . ."  She asked Aridai to persuade the girls "that they should really reconsider their statement," adding that "they don't have to mention the drugs."

Davis repeated a number of times during the conversation that the girls should not mention the drugs to the police, but should just tell them not to press charges.  "I'm not threatening at all," and "I'm just saying that's what's fair."  "My thing is that, don't lie.  Don't call the police and make a lie.  That's my only thing.  If [Alcala's] going to go down, then, then they're going to be reprimands for what they're doing, too."  She also repeated that "if . . . I have to let [the police] know what's really going on, then your

3

family is going to be in trouble." "I just want you to relay to them that if they can't tell the truth, then it's gonna get really serious, and it's not a threat, it's a promise."[2]

While repeating these messages to Aridai, Davis gave Aridai telephone numbers for both herself and Detective Batres, and told Aridai that her name was Carter. She also said that she had already spoken to Batres and planned to give her official statement the next day. She said that although Batres had told her not to talk to family members, she believed that she was free to do so in the absence of a restraining order.

Aridai's mother and sister Lilibeth arrived home as Davis was leaving. Her mother asked Davis who she was and what she was doing there, but Aridai said she would explain. Aridai then told her mother and sister what had happened, and played the audio recording for them. The next morning Aridai and her parents went to the police station and spoke to Batres—whom Aridai had not met before—about her conversation with Davis, but did not tell him about the audio recording.[3]

Later on December 7, 2011, Batres returned Davis's call from the previous day. Batres said he tried to determine whether he was speaking to someone named "Davis" or "Carter," and asked why she had threatened to call his watch commander. Apparently taking offense at Batres' tone, Davis hung up.

On December 12, 2011, Batres was at the courthouse with Lilibeth and Aridai for Alcala's arraignment or preliminary hearing when Aridai identified Davis as the person who had tried to persuade her on the evening of December 6 to have Lilibeth drop the robbery charges against Alcala. Batres then arrested Davis, advised her of her *Miranda* rights, and discussed with her the Alcala case and the events of the evening of

---

[2] During the recorded conversation Davis also recounted that Jocelyn had already agreed not to press charges, that the gun Alcala had been charged with using for the robbery had been a BB gun, and some of the reasons she believed Alcala's account of the facts was credible.

[3] According to Batres, Aridai also told him that when she arrived home before her conversation with Davis on the evening of December 6, she saw her mother speaking with Davis, and that her mother had then gone into the house while Davis spoke with Aridai.

December 6.  Davis told Batres that she was not a witness to the robbery between Alcala and Lilibeth, and did not know whether his gun was a real gun or a BB gun.  An audio recording of Batres's conversation with Davis on December 12 was played for the jury, and copies of a transcript of it were provided to the jurors.[4]

At the prosecution's request the court took judicial notice of a number of facts, including that Alcala had been charged with attempted robbery from Lilibeth Mendez; that Lilibeth had testified at his preliminary hearing on December 13, 2011; and that Alcala had been held to answer and was charged by information.  Alcala eventually pleaded guilty to the charges.

Davis testified on her own behalf.  She confirmed that she had spoken with Batres at the courthouse on November 29, attempting to tell him that "there was information that wasn't included" in the testimony (apparently at Alcala's arraignment) about the case, but that he did not seek to get any information at all from her.  She had then called Batres on December 6, identifying herself as a friend of the Alcala family.  She left a message that she had information that she felt needed to be heard, along with her name and phone number.  When Batres called her back, however, he asked her, abrasively, only about why she had threatened to call his watch commander, and did not want to hear anything about the case.  It was then that she went to speak with Aridai.

Davis testified that she went to the Mendez house on December 6 because she felt "there was some information that was withheld"—concerning the involvement of drugs in the supposed robbery—and intended only to speak with some adult, and "just to have everyone tell the truth and to be honest."  She had told Aridai that her name was Carter

---

[4] At the outset of the trial the court heard and denied a motion to exclude the audio recording of Davis's statement to Batres.  Davis argued that the *Miranda* admonition and her response to it were ambiguous in a number of respects, including that during the admonition, she had asked Batres whether or not she could have an attorney, to which he answered "Yes, you can."  But when she then asked, "Right now?," he replied, "No, not right now.  When you go to court."  Davis argued that the questioning then should have stopped and she should have been provided counsel.  The court agreed that Davis had "some possible ambiguity or confusion" about the admonition, but it denied the motion based on her recorded statement that she fully understood it.

(rather than Davis) because she did not really know who Aridai was, and that was a nickname she sometimes used. But she had not tried to hide who she was, by showing her face, telling Aridai that she was Alcala's girlfriend, and giving Aridai her telephone number. And she had identified herself also to Batres, and told him that she had spoken with Aridai. She did not tell Aridai what to say, but only tried to persuade Aridai—repeatedly—to have the family deal with the fact that the alleged robbery was really about efforts to get Alcala to give Lilibeth and Jocelyn drugs, and to warn them that the situation could lead to serious problems for Lilibeth and her parents.

## THE CASE

An information filed January 23, 2012, charged Davis with one felony count of attempting to dissuade Aridai Mendez, a witness to a crime, from causing the crime to be prosecuted. (Pen. Code, § 136.1, subd. (b)(2).) On January 23, 2012, upon the public defender's declaration of a conflict of interest, the alternate public defender was appointed to represent Davis. Davis pleaded not guilty, and the case was scheduled for pretrial hearing on January 30, 2012, for readiness hearing on February 17, 2012, and for jury trial on February 22, 2012.

Davis was first represented by Alternate Public Defender Monique Gregoire Williams at her January 30, 2012 pretrial hearing. On February 22, 2012, the date set for trial, an amended information was filed, changing the identity of the witness who Davis was charged with attempting to dissuade from Aridai to Lilibeth.

When the case was called for trial the next day, February 23, 2011, the trial court accepted Davis's plea of not guilty to the amended information. The court then denied, as untimely, Davis's motion to continue the trial to enable her to hire private counsel in light of the filing of the amended information. In denying the motion, the trial court noted that the information's amendment changed only the identity of the person Davis was charged with attempting to dissuade, from the sister of the victim of the robbery to

6

the actual victim of the robbery, but left unchanged all of the evidence and discovery.[5] Jury selection commenced that afternoon.

Before voir dire of the prospective jurors resumed on the afternoon of Friday, February 24, 2012, Davis's counsel informed the court that Davis had called her that morning, asking that she be permitted to represent herself in propria persona. Her counsel advised the court that Davis had told her she was educated as a nurse; that the case was simple, with perhaps just three witnesses; that there was nothing counsel could do to satisfy Davis that she was "doing the job that she would like me to do"; and that Gregoire Williams was prepared to "finish off the voir dire for her" before handing over the file to begin taking evidence on Monday. "It's her life. And it's her career that's at stake. And . . . if she feels that she can do a better job then she should be able to have that chance to do it. She's an intelligent person so she can probably handle it.

The trial court denied the motion, solely on the ground that the request was untimely. "I'm not making any legal findings on anything at this point other than the timeliness of the request and we need not get into other issues."

After telling Davis that her request was denied because "in my opinion, there's no reasonable argument that can be made for this request being made timely," Davis explained her request to the court: "I just thought I had a right to self-representation according to my Sixth Amendment right. It says that the right applies only at trial. And the full, you know, panel jury hasn't been selected. They haven't been sworn in yet. . . ." The court responded that "these requests need to be made timely," because "if we didn't have a timeliness requirement it would open the door to all kinds of switches at all kinds of awkward times." Because "this is, in my opinion, not close to a timely request," the court explained, "that will be denied."

---

[5] The trial court also denied Davis's motion to dismiss the charge against her under Penal Code section 995, and her motion under Penal Code section 632 to exclude Aridai's surreptitious audio recording of her December 6 conversation with Davis.

Jury selection was completed and the jury was sworn 45 minutes later. Alternate jurors were selected and sworn the morning of Monday, February 27, 2012. Jury deliberations began mid-afternoon, February 28, following the close of evidence; on the morning of February 29, 2012, the jury returned its verdict of guilty. On March 7, 2012, the court suspended imposition of sentence, ordering formal probation with various conditions, along with 150 days in county jail. Davis filed a timely appeal.

On appeal Davis contends that under both state and federal law her self-representation request was timely, thus depriving the trial court of discretion to deny it. To that contention she adds that even if the court was justified in concluding that her request was untimely, it erred by then failing to exercise its discretion to determine whether her self-representation request nevertheless should be granted; that if the court had exercised that discretion, her request should have been granted; and that her conviction cannot be sustained on the basis of a harmless-error analysis. We find merit in these contentions and therefore reverse her conviction and remand the case for a new trial.[6]

## DISCUSSION

A defendant in a state criminal trial has a federal constitutional right to represent herself without counsel if she voluntarily and intelligently elects to do so. (*Faretta v. California* (1975) 422 U.S. 806 (*Faretta*); *People v. Windham* (1977) 19 Cal.3d 121, 124 (*Windham*).) A trial court lacks discretion to deny a self-representation request if three conditions are met: the defendant is mentally competent and aware of the dangers of self-representation; the self-representation request is unequivocal; and the request is made "within a reasonable time before trial." (*People v. Welch* (1999) 20 Cal.4th 701, 729.) As a matter of federal constitutional law, when a motion to proceed pro se is timely

---

[6] Davis's appeal raises three additional issues: that reversal of her conviction is required because the court erred in admitting the recording of her conversation with Aridai because her Fifth Amendment right to an attorney was violated when Detective Batres told her she could not have an attorney until she went to court; and because the court imposed conditions of probation that are constitutionally overbroad and unreasonable. Because we agree with her first contention, we do not address the others.

interposed, a trial court must permit a defendant to represent himself upon ascertaining that he has voluntarily and intelligently elected to do so, irrespective of how unwise such a choice might appear to be." (*Windham*, *supra*, 19 Cal.3d at p. 128.)

The trial court in this case identified untimeliness as the sole ground for its denial of Davis's self-representation request; it expressly declined to make any inquiry or determination with respect to any "other issues." Under the test set forth in *Windham*, however, the timeliness of Davis's self-representation request must be the threshold inquiry. If Davis's self-representation request was timely, the trial court therefore would have no discretion to deprive her of her constitutional right to represent herself at trial without first ruling on her abilities and intentions—issues that it declined to consider and findings that it declined to make. (*People v. Welch* (1999) 20 Cal.4th 701, 729; *Windham*, *supra*, 19 Cal.3d at pp. 127-128 & fn. 5.)

A defendant's right to self-representation is invoked by her timely request. (*Windham*, *supra*, 19 Cal.3d at pp. 127-128), however (as the parties to this appeal agree), neither the United States Supreme Court nor the California Supreme Court have delineated a bright-line rule regarding when a motion for self-representation may be denied as untimely. (See *People v. Lynch* (2010) 50 Cal.4th 693, 722; *Windham*, *supra*, 19 Cal.3d at p. 128, fn. 5.) The courts have refused to identify a single point in time at which a *Faretta* motion becomes untimely rather than timely. (*People v. Clark* (1992) 3 Cal.4th 41, 99; *People v. Nicholson* (1994) 24 Cal.App.4th 584, 591.)

A request is timely as a matter of law if it is made a reasonable time before the commencement of trial. (*Windham*, *supra*, 19 Cal.3d at pp. 127-128.) In this case it is unnecessary for us to determine whether Davis's self-representation request met this timeliness standard, however. Whether her request was or was not timely as a matter of law, it unquestionably came at a time sufficient to invoke the trial court's discretion to grant the request upon consideration of appropriate factors—factors that the court expressly declined to consider. The effect of the trial court's ruling therefore was to hold that Davis's self-representation request was untimely as a matter of law. That error deprived Davis of the exercise of the court's discretion to which she was entitled.

9

### 1. Davis's Self-Representation Request Was Not As A Matter Of Law Untimely.

More than three decades ago our Supreme Court found in *Windham* that the commencement of trial marked the time at which a defendant's self-representation request could no longer be considered so timely as to entitle the defendant to self-representation as a constitutional right. (*Windham*, *supra*, 19 Cal.3d at p. 124.) In that case the trial court had denied the defendant's self-representation request, made shortly before the close of evidence on the last day of his three-day trial for assault, "principally on the ground that it came at too late a stage of the proceedings." (*Id.* at p. 125.) The Supreme Court concluded that a timely self-representation request must be granted, but once the trial had commenced, it was then "within the sound discretion of the trial court to determine whether such a defendant may dismiss counsel and proceed *pro se*." (*Id.* at pp. 124, 129 [failure to make a pretrial request for self-representation "amounts to a waiver of the unconditional right to proceed by way of self-representation"].)

In the following years numerous cases have cited the timeliness rule to uphold denials of self-representation motions that were made after, or only shortly before, the commencement of trial. But whether trial had or had not actually begun was rarely (if ever) the decisive central issue in those cases; the threat of delay in the trial or other disruption of the administration of justice was an ever-present factor controlling the timeliness determination. In *People v. Burton* (1989) 48 Cal.3d 843, for example, the court upheld the trial court's finding that the self-representation request was untimely, where the defendant's counsel had made several appearances in the six months following the preliminary hearing "in which [the defendant] could have invoked his right to represent himself," and that the self-representation request was accompanied by the defendant's assertion that "he was not ready to go to trial and needed an unspecified period for preparation." (*Id.* at p. 853.) In *People v. Clark*, *supra*, 3 Cal.4th 41, a multiple-murder trial that was anticipated to involve over 100 witnesses and six months to try (*id.* at p. 92), the court found no error where "'[a]ny dispassionate reading of this record reflects that this defendant was playing games with the court on this issue.'" (*Id.*

at pp. 96-97.) The self-representation motion had been made after some years of pretrial proceedings and two previous trial delays at the defendant's request, in conjunction with requests for further delays. (*Id*. at p. 101.) "In sum," the court concluded, "consideration of the *Windham* factors demonstrates that defendant's legitimate interests did not overbalance the disruption to the proceedings, delay, and potential for abuse which would be engendered by granting the motion." (*Ibid*.)

In *People v. Horton* (1995) 11 Cal.4th 1068, also a complex death-penalty case, the court upheld the trial court's denial of the defendant's trial-day request to represent himself, finding "that defendant's actions demonstrated an attempt to manipulate the judicial process, to obstruct his prosecution, and to delay the trial." It denied the self-representation motion on those grounds, "and additionally on the ground the request was untimely (having been asserted on the date scheduled for trial after numerous continuances)." (*Id.* at p. 1110.) Although the defendant had several earlier opportunities to request self-representation, the court explained, he failed to state any cause for his delay. (*Id*. at pp. 1110-1111.) And in *People v. Frierson* (1991) 53 Cal.3d 730, the defendant had moved to represent himself at his complex trial, set to begin just a few days later. The denial of his request was upheld on the ground that it was not made within a ""'"reasonable time prior to the commencement of trial,"''" where the record showed that the trial court had "thoroughly investigated the quality of counsel's representation, the reasons for the request, and the expected delay." (*Id.* at p. 742; see also *People v. Williams* (1990) 220 Cal.App.3d 1165, 1170 [denial of self-representation motion upheld on ground that record showed that defendant "was playing the '*Faretta* game'"].)

Respondent relies on *People v. Jackson* (2009) 45 Cal.4th 662, in which the court repeated its observation that "[t]his court never has 'establish[ed] a hard and fast rule that any motion made before trial—no matter how soon before—was timely.'" (*Id.* at p. 689, citing *People v. Burton*, *supra*, 48 Cal.3d at pp. 853-854, & fn. 2.) In *People v. Burton*, the court had noted—but declined to adopt—the rule stated in many federal cases, "that a motion for self-representation is normally timely as a matter of law if made before the

11

jury is impaneled, so that the motion must be granted unless it is shown that the motion is made for the purpose of delay."[7] (48 Cal.3d at p. 853.) However the *Burton* court's reason for California's rejection of that rule is instructive: "The federal rule, though it calls motions timely until the jury is impaneled, may in practice differ little from our own rule," because under the federal rule, even a timely self-representation motion may be denied in the court's discretion "if the court finds the motion is made for the purpose of delay." (*Id.* at p. 854.) The *Burton* court found that "[t]his differs little as a practical matter from the standard we set out in *Windham* . . . except that we place the burden on the defendant to explain his delay when he makes the motion as late as defendant did here." (*Ibid.*)

The *Windham* court looked beyond any bright-line measure of when trial begins to determine the timeliness of a self-representation request, however, it explicitly warned that the rule requiring a timely request for self-representation should not be invoked without justification. The timeliness rule "should not be and, indeed, must not be used as a means of limiting a defendant's *constitutional* right of self-representation." (19 Cal.3d at p. 128, fn. 5.) The rule's only intention is "that a defendant should not be allowed to misuse the *Faretta* mandate as a means to unjustifiably delay a scheduled trial or to obstruct the orderly administration of justice." (*Ibid.*) Whether a self-representation request should be granted therefore is a matter of trial court discretion when, for example, a defendant has waited "until the day preceding trial before he moves to represent himself *and requests a continuance in order to prepare for trial.*" But when the lateness of the request and the necessity of a continuance can be reasonably justified, "the request should be granted." (*Id.* at p. 128 & fn. 5, italics added.)

---

[7] See, e.g., *Armant v. Marquez* (9th Cir. 1985) 772 F.2d 552, 555; *Fritz v. Spalding* (9th Cir. 1982) 682 F.2d 782, 784; *Maxwell v. Sumner* (9th Cir. 1982) 673 F.2d 1031, 1036; *Chapman v. United States* (5th Cir. 1977) 553 F.2d 886, 894; *United States v. Dougherty* (D.C. Cir. 1972) 473 F.2d 1113, 1124; *United States ex rel. Maldonado v. Denno* (2d Cir. 1965) 348 F.2d 12, 16.

In this case Davis requested no continuance, and nothing in the record indicates that granting her self-representation request would have entailed any significant delay. On Wednesday, February 22, the court called the case for trial, with an estimate of seven days of trial (afternoons only), and ordered a jury panel for the next day. The next day, Thursday February 23, the trial court arraigned Davis on an amended information that changed the identity of the victim of the alleged crime, to which Davis pleaded not guilty. During the morning session the court denied, as untimely, Davis' motion to continue the trial in order to hire private counsel. It also denied motions under Penal Code section 995 to reduce the charge to a misdemeanor, and to exclude the audio record of the conversation between Davis and Batres.

Jury selection began Thursday afternoon at 2:00. At 4:15 p.m. the jury panel was excused and told to return on the afternoon of Friday, February 24, at 1:30 p.m.

On Friday afternoon, February 24, before jury selection resumed, Davis's counsel informed the court of Davis's request to represent herself in pro. per. She did not request any continuance of the trial, and she explained to the court how the matter could be handled without any delay.[8] The trial court denied her request as untimely, without "making legal findings on anything at this point other than the timeliness of the request . . . ."

After the court had denied her self-representation request, Davis suggested to the court that her request was timely because the jury had not yet been impaneled. The court responded that the absence of a timeliness requirement "would open the door to all kinds of switches at all kinds of awkward times." But the court did not address Davis's contention that her request was in fact timely, because the jury was not yet impaneled. Nor did the court indicate why granting her request would be awkward under the circumstances of her case, or inquire whether any delay would be necessary.

---

[8] Advising the court of Davis's self-representation request, her counsel noted that the case was not complicated, and would involve at most just three witnesses. Her counsel suggested that she could complete the jury voir dire that same afternoon—Friday—and that Davis would be ready to take over on Monday.

Less than an hour later 12 jurors were sworn and were ordered to return for trial Monday afternoon. Two alternate jurors were selected and sworn on the morning of Monday, February 27. Opening statements began on Monday afternoon.

Nothing in the record suggests that granting Davis's self-representation request would have delayed the trial or resulted in any obstruction of the administration of justice; the record actually indicates that no delay would have resulted. When the court denied Davis's self-representation request that Friday afternoon, it told the prospective jurors that "[w]e will finish picking a jury and then get you folks on the way and get an early jump on traffic." Without any delay in the proceedings, opening statements were thus set to begin the following Monday afternoon—the same time that Davis had told the court she would be ready to defend herself.

Moreover, in denying the request the court disclaimed reliance on any factor other than the request's untimeliness. It denied Davis's self-representation request on the sole ground that jury selection had begun. It declined even to consider the concerns—delay or obstruction of the orderly administration of justice—that *Windham* identified as factors that could justify denial of a self-representation request. (19 Cal.4th at p. 128, fn. 5.) In other words, the trial court used timeliness as "a means of limiting [Davis's] *constitutional* right of self-representation"—exactly what *Windham* warned that it cannot do. (*Ibid*.)

In *People v. Nicholson*, *supra*, 24 Cal.App.4th 584, the defendant's self-representation request was made on the date set for trial. The court nevertheless held that "where self-representation is requested for a legitimate reason, where there is no request for a continuance and where there is no reason to believe there would be any delay or disruption, the trial court's denial of a *Faretta* motion is an abuse of discretion." (*Id.* at p. 593; see *People v. Herrera* (1980) 104 Cal.App.3d 167, 174 ["To hold that a motion for self-representation made by a defendant at his earliest opportunity is untimely when that 'earliest opportunity' appears to be shortly before trial, would effectively thwart defendant's constitutional right to proceed in propria persona."].)

14

On this record it therefore is clear that the denial of Davis's self-representation request cannot be validated solely by the trial court's conclusion that the request was untimely. While no case holds that a request made during jury selection is necessarily *timely*, neither does any authority support the proposition that the request was necessarily *untimely*, without regard to any other consideration. Thus even accepting the trial court's conclusion that the self-representation request came too late to require that it be granted, in exercising its discretion to determine whether to grant the request the trial court was required to consider factors other than just the timing of the request.

## 2. The Trial Court Failed To Exercise Its Discretion To Determine Davis's Self-Representation Request Upon The Factors Identified By *Windham*.

Once a trial has commenced, it is "within the sound discretion of the trial court to determine whether such a defendant may dismiss counsel and proceed pro se." (*Windham*, *supra*, 19 Cal.3d at pp. 124, 129.) But untimeliness is just one factor to be considered; untimeliness alone cannot be used to deny self-representation, without regard to other factors. When the lateness of the request and any resulting need for delay can be reasonably justified, "the request should be granted." (*Id.* at p. 128, fn. 5, italics added.)[9]

We do not hold that the trial court would have lacked discretion to deny Davis's self-representation request, had its discretion been exercised. But it is not clear that denial of the motion would have been a foregone conclusion if the court had exercised its discretion after considering the appropriate factors. The record shows no hint that Davis's self-representation request was motivated by a desire or expectation that it would delay her trial or unduly burden the administration of justice, and the trial court declined to consider whether it would. When she made her self-representation request, only a

---

[9] In *People v. Tyner* (1977) 76 Cal.App.3d 352, 355, the defendant's self-representation motion was made and denied after the case was called for trial. His robbery conviction nevertheless was reversed, because his motion came before the jury was impaneled, and had not been accompanied by any request for a continuance. Granting the motion therefore would not have obstructed the orderly administration of justice, making the defendant's right of self-representation "unconditional." Respondent's brief does not address the opening brief's reliance on this decision.

matter of weeks, and a few appearances, had passed since the appointment of the alternate public defender as her counsel.[10] Her counsel noted (without dispute) that the trial would be short, that the factual and legal issues were uncomplicated, that Davis was educated and capable of defending herself, and that no delay would be necessary. And Davis's own explanation to the court demonstrated some genuine understanding of the law on her part.

However, we need not determine whether the court would have been justified in denying Davis's self-representation request after considering these factors, because it did not consider them. Although there is no requirement that the trial court explicitly cite the *Windham* factors or state its reasons for denying an untimely self-representation request (*Windham*, *supra*, 19 Cal.3d at p. 129, fn. 6; *People v. Bradford* (2010) 187 Cal.App.4th 1345, 1354), the record must reflect some substantial support for an inference that the trial court "had those factors in mind when it ruled." (*People v. Bradford*, *supra*, 187 Cal.App.4th at p. 1354; *People v. Scott* (2001) 91 Cal.App.4th 1197, 1206.) Here, the trial court's express disclaimer foreclosed any such inference. As it stated for the record, "I'm not making any legal findings on anything at this point other than the timeliness of the request . . . ."

Even if the request could be considered untimely because jury selection had commenced, the court was nevertheless required to consider the factors identified in *Windham* before exercising its discretion to deny Davis's request. (19 Cal.3d at pp. 128-129 ["Having established a record based on such relevant considerations, the court should then exercise its discretion and rule on the defendant's request."].) The trial court therefore erred by declining to consider the factors upon which its discretion to determine whether Davis's self-representation request—even if untimely—must be based.

---

[10] Davis was first represented by Alternate Public Defender Gregoire Williams at the January 30, 2012 pretrial hearing.

16

### 3. The Court's Failure To Exercise Its Discretion Cannot Be Dismissed As Harmless.

In *Windham*, *supra*, our Supreme Court found it "unnecessary to determine by what standard of reversible error the erroneous denial of a *Faretta* motion should be judged." (19 Cal.3d at p. 131, fn. 7.) Subsequent cases have indicated that denial of a timely self-representation request is reversible per se. (*People v. Joseph* (1983) 34 Cal.3d 936, 948; *People v. Tyner*, *supra*, 76 Cal.App.3d 352, 356 ["Adoption of any other standard would tend to eviscerate the *Faretta* holding"].) But the erroneous denial of a *Faretta* motion that is untimely is reviewed under the harmless error test of *People v. Watson* (1956) 46 Cal.2d 818, 836—whether it is "reasonably probable" that a result more favorable to the appellant would have been reached in the absence of the error. (*People v. Rivers* (1993) 20 Cal.App.4th 1040, 1050.) This is because "the denial of a pretrial motion is a matter of constitutional magnitude, whereas the denial of a midtrial motion is not." (*People v. Nicholson*, *supra*, 24 Cal.App.4th at p. 591; *People v. Bloom* (1989) 48 Cal.3d 1194, 1220; see Cal. Const. art. VI, § 13.)

In *People v. Nicholson*, as in this case, the self-representation request had been made after the case had been called for trial, but before the jury was sworn—a time that might or might not be considered to be "before the commencement of trial" within the meaning of *Windham*. (*People v. Nicholson*, *supra*, 24 Cal.App.4th at p. 591.)[11] And as in this case, the self-representation request was made soon after the appointment of defense counsel; it was not part of a pattern of delay or disruption of the proceedings; no delay of the trial was requested, and nothing in the record indicated a delay would be necessary. (*Id.* at p. 592.) On this record it is not at all clear that the trial court would have been justified in exercising its discretion to deny Davis's self-representation request, even if it had considered the relevant factors on their merits. (*People v. Tyner*, *supra*, 76

---

[11] Trial commences, at least for double-jeopardy purposes, when the jury is sworn. (*People v. Rogers* (1995), 37 Cal.App.4th 1053, 1057, fn. 3; *People v. Gephart* (1979) 93 Cal.App.3d 989, 998.)

Cal.App.3d 352, 354-355 [self-representation motion made on first day of trial, but before jury was impaneled, should have been granted as timely].)**[12]**

However, even if we were to conclude that Davis's self-representation request was untimely as a matter of law (which we decline to do, as discussed above), still we cannot conclude that no prejudice resulted from the trial court's failure to examine the factors that should control its exercise of discretion, and to exercise its discretion based on those factors. Although it is rare that an untrained defendant might have been able to prevail before the jury, while her experienced and admittedly competent attorney could not, we so conclude in this case.

Davis's defense had little to do with proof of disputed facts. The events supporting the charge against Davis were virtually undisputed; it was primarily Davis's intent that was in dispute. Davis was charged with attempting to dissuade a witness to a crime from causing the crime to be prosecuted. (Pen. Code, § 136.1, subd. (b)(2).) The entire conversation in which she was found to have done so was presented to the jury in both a 20-minute audio recording and a written transcript of that recording. The case had no complex legal or evidentiary issues. Davis's defense rested instead almost wholly on persuading the jury of her lack of criminal intent in speaking with Aridai, saying what she undeniably said in the audio recording of that conversation.

Davis's statements were unquestionably sufficient to justify the charge of attempting to dissuade a witness, and to support the verdict against her; her appeal does not contend otherwise. But she also tried to offer explanations for much of her conversation with Aridai, which— if her good intentions were credited and she were

---

**[12]** In *People v. Nicholson*, the court observed that when that case was decided "[e]very case upholding a discretionary denial of a *Faretta* motion involve[d] a request for a continuance (or some other delaying tactic) or a demonstrated proclivity to substitute counsel or both" (24 Cal.App.4th at pp. 592-593, & fn. 5); and the only reported decisions in which *Faretta* motions had been denied when the defendants were ready to proceed without a continuance had resulted in reversals. (*Id*. at p. 593.) We believe that this observation remains true.

18

afforded the benefit of many doubts—might have persuaded a sympathetic jury to see a picture somewhat different from that painted by the prosecution.

She apparently wanted to persuade the jury that she had gone to talk to Aridai (or any other adult in the family) out of concern not only for Alcala, but also to warn the Mendez family that the supposed robbery with which Alcala was charged—in which Lilibeth and Joselyn were the supposed victims—was not a robbery at all but arose from the girls' efforts to get drugs from Alcala. She sought to warn Aridai that she felt compelled to advise Detective Batres of those facts, and to warn her of the impact on her family once her younger sister's involvement with drugs became known. It is true—as the prosecution argued effectively to the jury—that crediting Davis's story would not wholly negate the elements of the offense with which she was charged. However it might have negated the specific intent that the jury was required to find—and did find—she had when she spoke to Aridai.

If the trial court had properly exercised its discretion, it could have determined whether Davis should be permitted to present her theory of the facts to the jury personally, not just through her testimony but also personally through her argument to the jury. We cannot know with certainty whether she would have been entitled to that opportunity if the court had properly exercised its discretion, nor whether she might have persuaded the jury that her intent was not criminal had she had that opportunity. However, on this record we cannot conclude that she would not.

## CONCLUSION

A new trial is required. We therefore do not reach Davis's other claims of error.

19

**DISPOSITION**

The judgment is reversed.

NOT TO BE PUBLISHED

.

CHANEY, J.

We concur:

ROTHSCHILD, Acting P. J.

JOHNSON, J.

20